United States District Court
Southern District of Texas
**ENTERED**
August 30, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KENNETH MITCHELL, | § | CIVIL ACTION NO. |
| Plaintiff, | § | 4:18-cv-04052 |
| | § | |
| | § | |
| vs. | § | JUDGE CHARLES ESKRIDGE |
| | § | |
| | § | |
| CITY OF HOUSTON, | § | |
| *et al*, | § | |
| Defendants. | § | |

OPINION AND ORDER
GRANTING SUMMARY JUDGMENT

The motion by Defendants for summary judgment is granted. Dkt 55.

1. Background

The following facts aren't disputed except where noted.

Plaintiff Kenneth Mitchell was hired by the Houston Police Department as an officer in January 2006 after serving as a cadet since July 2005. He requested and received an assignment in the Willowbrook neighborhood of Northwest Houston in 2016. He did so because he lived near Willowbrook and wanted to be closer to friends and family. Dkt 55-1 at 5; Dkt 8 at ¶¶ 10 & 13. Mitchell was eventually promoted to the role of Senior Police Officer at some point in 2017. Dkt 55-1 at 4.

HPD Chief Art Acevedo created the new North Belt Division in 2017 and appointed Captain Daryn Edwards to develop it. The North Belt Division combined four existing territories (or beats) that police officers patrol—two in Greenspoint, one in Willowbrook, and one around Intercontinental Airport. The Greenspoint beats are to the north in Harris County, the Willowbrook beat is to the

northwest, and the Intercontinental beat is to the northeast. Dkt 55-4 at 7–8.

Edwards sought to centralize the North Belt Division in Greenspoint. He made this decision after reviewing several empirical studies and consulting other chiefs and the management team of the North Belt Division. Dkt 55-4 at 26 & 47–48; see also Dkt 8 at ¶ 24. Under his plan, HPD officers like Mitchell—who reported to the Willowbrook storefront, a community police facility—would instead report to the Greenspoint police station. Dkt 55-4 at 25–26 & 47–48.

Mitchell learned about this potential change in March 2018 during an informal conversation with several sergeants assigned to Willowbrook. Dkts 55-1 at 10–11 & 55-2 at 2. The change at that time was still tentative and not public information. Dkts 55-1 at 9 & 55 at 17.

Mitchell met with Sergeant Jason Fenn later that month. Dkts 55-1 at 8, 55-2 at 2 & 55-8 at 4. They discussed contacting the president of the Houston Northwest Chamber of Commerce, Larry Lipton, to prevent implementation of Edwards' plan. Dkts 55-1 at 8, 55-2 at 2, 55-6 at 2 & 55-8 at 4. Whether Mitchell volunteered or was directed to contact Lipton is disputed. Dkts 55 at 11, 55-2 at 3 & 61 at 7. But all parties agree that Mitchell was to contact Lipton.

Mitchell first contacted Lipton by telephone while on duty on March 22, 2018. The exact details of this initial conversation are unclear from the record. But Mitchell identified himself as an HPD officer and expressed his concerns about the potential change in reporting location from Willowbrook to Greenspoint. Dkt 55-1 at 8–9. Lipton apparently told Mitchell that he would "do his best to advocate" for him and requested a follow-up email identifying the issues and arguments against the change. Dkt 55-2 at 3.

Mitchell that same day sent the requested email from his personal email address while off-duty. Dkt 55-1 at 10. He explained that HPD intended to change the reporting

location for Willowbrook officers from the Willowbrook storefront to the Greenspoint station. Dkt 55-3 at 2. And he made the following contentions, among many others:

- o "The reason [this change] affects the safety, because a unit will no longer be able to hop into a car as soon as they get to work and respond to a high priority call in Willowbrook."
- o "Once officers start reporting to [Greenspoint], the Staff will just send random officers to [Willowbrook storefront] whenever a call has to be ran and start neglecting Willowbrook for [Greenspoint]."
- o "Management is just gambling, betting that nothing will happen or the incidents that hold will not progress, because the units in [Greenspoint] are tied up switching shifts and finishing their late calls."
- o "An active shooter or serious incident will happen in Willowbrook."
- o "Bottom line, HPD will never admit it, but Willowbrook will have no one at its post approximately 3 times a day from 40 minutes to 60 minutes, nearest HPD officer will be 13 minutes away, with no traffic. However, the dispatcher will have to find an officer to dispatch that isn't tied up or send a sergeant which will take 10 minutes and that would be for a high priority call. If not a Code 1 or 2, they will downgrade the call and just have it hold possibly as I have seen up to 2 to 3 hours."
- o "2/3 of the Sergeants and Officers were originally part of [Greenspoint], and have the mentality that nothing happens in [Willowbrook storefront]. They believe (with some good reason) that [Greenspoint] is one of the roughest parts of the city, and because they care about their beat, they are willing to sacrifice the coverage and protection of

3

> > Willowbrook, to use [Willowbrook storefront] resources for [Greenspoint]."
> > - "Already Willowbrook has lost its resources and gotten the short end of the stick."
> > - "In conclusion, add the time for the unit coming off in Greenspoint with the time of the Officer arriving at work to arrive to Willowbrook, and you can see where that will leave Willowbrook, no matter how the brass attempts to sugar coat it to the civilians and public."

Dkt 55-3 at 3–4 (alterations for clarity without correction for spelling, grammar, and punctuation).

Lipton later forwarded Mitchell's email to the Willowbrook Mall manager, the director of security at Willowbrook Methodist Hospital, Harris County Sheriff's District Commander Captain Jay Coons, and Harris County Precinct 4 Constable Mark Hermann. Dkt 8 at ¶¶ 1, 28. He also shared it with Mitchell's shift lieutenant, Lieutenant Bridget Lummus. Dkt 55-4 at 19. Lummus then filed a complaint against Mitchell on March 29, 2018. She alleged that the email sent by Mitchell to Lipton "is written in a way that would bring alarm to the citizens of the community," "sheds a negative light upon the department," and was "written in poor taste and poor judgment." Dkt 55-6; see also Dkts 55-8 at 2 & 55 at 11.

Complaints against HPD employees generally proceed in six steps as follows. *First,* upon receipt, the Internal Affairs Division opens an investigation. Dkt 55-10 at 18. That investigation typically concludes within sixty days and results in a final allegation recommendation of "never formalized, sustained, not sustained, exonerated or unfounded." Id at 19–20. *Second,* when an allegation is sustained, the accused employee meets with his legal representative, shift supervisor, immediate supervisor, and division manager "to review and discuss the findings of the investigation" and "to reach an agreement on the disciplinary range category for the infraction." Id at 22–23. *Third,* the assistant chief for the division reviews the

4

recommended discipline category and indicates his agreement or disagreement. Id at 24. *Fourth,* the Administrative Disciplinary Committee reviews all findings and produces a report to the Chief of Police "documenting the sufficiency of the investigation and describing recommended disciplinary action." Ibid. *Fifth,* the Chief of Police conducts a disciplinary review meeting at which the accused employee may once again plead his case. Id at 69; see also Dkt 55-13 at 2. *Sixth,* the Chief of Police issues a final decision, which the employee may appeal. Dkts 55-10 at 65–66 & 55-18 at 46–51.

The complaint against Mitchell tracked the first four steps of the above format. *First,* the Internal Affairs Division notified Mitchell of the complaint in early April 2018 and opened an investigation. Dkt 55-5. Assistant Chief Troy Finner temporarily reassigned Mitchell to dispatch pending the investigation. Finner maintains that this wasn't in any way punitive but is instead a common practice to avoid unnecessary friction during an investigation. Dkt 55-7 at 19–20. Mitchell contends to the contrary that being sent to dispatch is a "well-known form of punishment." Dkt 8 at ¶ 31. And Finner acknowledges that some officers may view being sent to dispatch negatively. Dkt 55-7 at 19.

The Internal Affairs Division concluded its investigation in May 2018. Dkt 55-8. It found that Mitchell's email to Lipton violated General Order 200-08, which provides:

> Employees shall neither publicly nor at internal official meetings criticize or ridicule the department or any of its policies, City officials, or other employees by speech, writing, or other expression that is defamatory, obscene, or unlawful, or that undermines the effectiveness of the department or interferes with the maintenance of discipline, or is made with reckless disregard for truth or falsity.

5

Id at 8–9. The report further found that Mitchell's email contained inflammatory comments, and that he "should have reasonably been aware" that such comments "would cause fear and safety concerns in the reader." Id at 9. The report also determined that Mitchell "recklessly disregarded the truth" when he stated in his email that the change of reporting location would result in a lack of police resources and extended response time for Willowbrook. Ibid.

*Second,* Lummus (as Mitchell's shift lieutenant) and Edwards (as his division command) met with Mitchell on June 19, 2018. They considered the findings of the Internal Affairs Division, any mitigating or aggravating factors, and Mitchell's past conduct. They ultimately recommended a discipline category of D, which is reserved for "[f]irst occurrence of severe rules violations" and carries a ten-to-fifteen-day suspension. Dkts 55-9 (disciplinary category worksheet) & 55-10 at 49 (corrective action manual).

*Third,* Finner reviewed the recommendation and concurred with the decision. Dkt 55-9 at 3.

*Fourth,* the Administrative Discipline Committee reviewed the investigation and the division command recommendation. The committee recommended a discipline category of E, which is reserved for "[f]irst occurrence of egregious rules violations." Dkt 55-11. Such an offense carries the possibility of an indefinite suspension, a sixteen-to-ninety-day suspension by agreement, and/or a demotion. Ibid; see also Dkt 55-10 at 49. Though the "vote for the recommendation of an indefinite suspension was unanimous," the committee wasn't "opposed to a lengthy suspension." Dkt 55-11.

Mitchell was relieved of duty with pay effective June 27, 2018, pending a disciplinary review meeting with Acevedo. Dkts 55-1 at 17 & 55-12. The suspension also prohibited him from working any extra jobs. Dkt 55-1 at 17. It's unclear if Mitchell had been working other jobs while serving as an HPD officer, but it appears that he was at least able to do so before he was taken off duty. Ibid.

6

Neither the *fifth* nor the *sixth* steps—including the meeting with Acevedo—ever occurred. Mitchell had graduated law school at some point while serving as an HPD officer, and he desired to start his own firm. Dkts 55-1 at 4, 17 & 55-14 at 4. Mitchell thus inquired about the possibility of resigning with an honorable discharge. Dkts 55-1 at 17, 55-14 at 4 & 61-1 at 18. Houston Police Officer's Union President Ray Hunt contacted either Acevedo or Ann Spiegel (Deputy Director of Chief's Command—Legal Services) about this request, and one or both informed Hunt that the Department would allow Mitchell to resign honorably. Dkt 55-14 at 4. Both Hunt and Spiegel communicated this fact to the union attorney representing Mitchell at the time. Dkts 55-14 at 4–5, 55-16 & 61-1 at 8–9, 12, 14. And so, Mitchell subsequently resigned with an honorable discharge on July 12, 2018. Dkts 55-1 at 17 (Mitchell deposition), 55-17 (resignation) & 61-2 (discharge paperwork).

Acting on his own behalf, Mitchell brought this action in October 2018, naming only the City of Houston as a defendant. Dkt 1. He amended his complaint four days later to add Acevedo. Dkt 4. Mitchell later secured representation and filed a second amended complaint, adding Finner and Edwards as defendants. Dkt 8. All claims asserted in the complaint proceed under 28 USC § 1983, but without clarity as to which claims Mitchell brings against each Defendant. See Dkt 8 at ¶¶ 37–42. It's assumed that he brings First Amendment retaliation and bystander-liability claims against Acevedo, Finner, and Edwards in their individual capacities, as well as a *Monell* municipal-liability claim against the City.

Defendants jointly moved for summary judgment after discovery concluded. Dkt 55. They contend that Mitchell failed to establish a claim for First Amendment retaliation, bystander liability, or *Monell* liability. Acevedo, Finner, and Edwards also assert qualified immunity. The parties were granted leave to submit supplemental briefing, and argument was heard on the motion in January 2022. See Dkts 80, 81, 82 & 83.

7

2. Legal standard

Rule 56(a) of the Federal Rules of Civil Procedure requires a court to enter summary judgment when the movant establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is *material* if it "might affect the outcome of the suit under the governing law." *Sulzer Carbomedics Inc v Oregon Cardio-Devices Inc*, 257 F3d 449, 456 (5th Cir 2001), quoting *Anderson v Liberty Lobby Inc*, 477 US 242, 248 (1986). And a dispute is *genuine* if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v CCC & R Tres Arboles LLC*, 736 F3d 396, 400 (5th Cir 2013), quoting *Anderson*, 477 US at 248.

The summary judgment stage doesn't involve weighing the evidence or determining the truth of the matter. The task is solely to determine whether a genuine issue exists that would allow a reasonable jury to return a verdict for the nonmoving party. *Smith v Harris County*, 956 F3d 311, 316 (5th Cir 2020). Disputed factual issues must be resolved in favor of the nonmoving party. *Little v Liquid Air Corp*, 37 F3d 1069, 1075 (5th Cir 1994). All reasonable inferences must also be drawn in the light most favorable to the nonmoving party. *Connors v Graves*, 538 F3d 373, 376 (5th Cir 2008).

The moving party typically bears the entire burden to demonstrate the absence of a genuine issue of material fact. *Nola Spice Designs LLC v Haydel Enterprises Inc*, 783 F3d 527, 536 (5th Cir 2015); see also *Celotex Corp v Catrett*, 477 US 317, 322–23 (1986). But when a motion for summary judgment by a defendant presents a question on which the plaintiff bears the burden of proof at trial, the burden shifts to the plaintiff to proffer summary judgment proof establishing an issue of material fact warranting trial. *Nola Spice*, 783 F3d at 536. To meet this burden of proof, the evidence must be both "competent and admissible at trial." *Bellard v Gautreaux*, 675 F3d 454, 460 (5th Cir 2012).

### 3. First Amendment retaliation claims

The First Amendment to the United States Constitution in pertinent part provides, "Congress shall make no law . . . abridging the freedom of speech." This right "has been incorporated to apply to the states via the Due Process Clause of the Fourteenth Amendment." *White v Sanders*, 49 F3d 728, 1995 WL 103629, *1 n 4 (5th Cir, *per curiam*), citing *Gitlow v New York*, 268 US 652, 666 (1925). It may be enforced against state officials through 28 USC § 1983. See *Nixon v City of Houston*, 511 F3d 494, 497 (5th Cir 2007).

The Fifth Circuit recently summarized First Amendment law as it applies to public employers:

> When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. This is because the public employer, like any principal, has an interest in controlling the activities of its agents, including employee speech that contravenes the public employer's policies or impairs the proper performance of its functions. Even if the employer has such an interest, however, that interest must still be balanced against the employee's own interests: A citizen who works for the government is nonetheless a citizen, and the First Amendment limits the ability of a public employer to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.

*Bevill v Fletcher*, 26 F4th 270, 276 (5th Cir 2022) (cleaned up).

To state a viable First Amendment retaliation claim, a state employee must demonstrate that (i) he suffered an adverse employment action, (ii) he spoke as a citizen on a matter of public concern, (iii) his interest in the speech outweighs the government's interest in the efficient

provision of public services, and (iv) the speech precipitated the adverse employment action. *Anderson v Valdez*, 845 F3d 580, 590 (5th Cir 2016); see also *Bevill*, 26 F4th at 276.

Mitchell's retaliation claims founder on the first prong. Quite simply, he didn't suffer an adverse employment action.

### a. Adverse employment actions, considered

With respect to the requirement of an *adverse employment action*, Mitchell advocates for application of the *materially adverse* standard used in Title VII actions. Dkt 61 at 12–13. Under that standard, an employee "must show that a reasonable employee would have found the challenged action materially adverse." *Burlington Northern & Santa Fe Railway Co v White*, 548 US 53, 68 (2006). In other words, the question is whether the action "might have dissuaded a reasonable worker from" engaging in the protected conduct at issue. Ibid (quotation marks and citation omitted).

The Supreme Court hasn't spoken on whether that standard applies to First Amendment retaliation claims. See *Houston Community College System v Wilson*, 142 S Ct 1253, 1261 (2022) (noting that "lower courts have taken various approaches" to distinguish *material* from *immaterial* adverse actions). Neither has the Fifth Circuit. See *Spears v McCraw*, 2021 WL 3439148, *2 (5th Cir, *per curiam*), citing *Johnson v Halstead*, 916 F3d 410, 422 n 5 (5th Cir 2019). This alone precludes its application to the claims brought by Mitchell against the individual Defendants, as the law in that regard isn't clearly established for the purpose of qualified immunity. See *Harmon v Dallas County*, 927 F3d 884, 892 (5th Cir 2019, *per curiam*); *Brown v Tarrant County*, 985 F3d 489, 495 (5th Cir 2021).

Regardless, the Fifth Circuit has steadfastly limited *adverse employment actions* to "ultimate employment decisions," such as "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Foley v University of*

*Houston System*, 355 F3d 333, 341 (5th Cir 2003); *Breaux v City of Garland*, 205 F3d 150, 157 (5th Cir 2000) (quotation marks and citation omitted). Mitchell offers no persuasive argument to water down this precedent. Indeed, the Fifth Circuit has "declined to expand the list of actionable" claims in the First Amendment context, "noting that some things are not actionable even though they have the effect of chilling the exercise of free speech." *Benningfield v City of Houston*, 157 F3d 369, 376 (5th Cir 1998). As explained in *Breaux*, "The reason for not expanding the list of adverse employment actions is to ensure that § 1983 does not enmesh federal courts in relatively trivial matters." 205 F3d at 157 (quotation marks and citation omitted).

Application here of the *materially adverse* standard used in Title VII actions must therefore be rejected. Instead, adverse employment actions are restricted to *ultimate employment decisions*. See *Foley*, 355 F3d at 341; *Breaux*, 205 F3d at 164; see also *Jackson v Texas Southern University*, 997 F Supp 2d 613, 638 (SD Tex 2014).

>> b. Adverse employment actions, applied

Mitchell contends that the "formal communications chastising him for his actions and informing him of a temporary suspension" constitute a reprimand. Ibid. He also maintains that "the threat of a less than honorable discharge should clearly be considered the denial of a benefit because of its bearing on future employment." Id at 17. And the combination of the alleged reprimand and threat, he argues, "effectively forced [him] to resign." Id at 12, 16–17.

None of these arguments withstand scrutiny under the pertinent standard.

>> i. Reprimand, temporary transfer, and temporary suspension

The Fifth Circuit has unequivocally stated that investigations like the one at issue here are *not* adverse employment actions. *Breaux*, 205 F3d at 157–58. In such light, nonpublic communications informing Mitchell of the status of the investigation obviously can't constitute an

11

adverse employment action. See id at 164 (rejecting as basis for First Amendment retaliation claim "mere accusations" and public-but-withdrawn reprimand). Nor can his temporary transfer to dispatch or his temporary suspension with pay and benefits. See *Brown v City of Saltillo*, 106 F Supp 3d 784, 789–90 (ND Miss 2015) (collecting cases holding that temporary suspensions with pay and benefits that occur during investigations can't serve as basis for First Amendment retaliation claim).

True, the temporary suspension prevented Mitchell from working overtime or participating in outside employment opportunities for two weeks. But that's simply what happens during any investigation—whether or not related to putative First Amendment conduct. And the Fifth Circuit holds that such losses incident to an investigation don't constitute adverse employment actions. Indeed, it found in *Breaux* that actions incident to an investigation such as "reprimands, psychological and polygraph testing, suspension with pay," and transfer to what the plaintiff asserted was a less desirable unit didn't "either individually or collectively constitute adverse employment actions." 205 F3d at 164.

ii. Threat of less than honorable discharge

Scant record evidence supports contention that Mitchell faced a less than honorable discharge, though some documents suggest that an indefinite suspension may result in an involuntary separation from HPD. For example, see Dkt 55-19 at 58; see also Dkt 55-14 at 9 (Hunt deposition) (stating belief that dishonorable discharge was never "on the table"). Regardless, the Fifth Circuit is absolutely clear on this point. The mere threat or potential of an ultimate employment decision is insufficient to establish an adverse employment action. *Breaux*, 205 F3d at 160. Hypothetical future harm simply doesn't suffice.

As the allegedly threatened discharge here was never realized, it plainly can't serve as the basis for Mitchell's First Amendment retaliation claim.

iii. Alleged constructive discharge

The Fifth Circuit "has 'recognized that constructive discharge may be an appropriate basis for a section 1983 action.'" *Caldwell v Lozano*, 689 F Appx 315, 319 (5th Cir 2017, *per curiam*), quoting *Kline v North Texas State University*, 782 F2d 1229, 1234 (5th Cir 1986). But to prove constructive discharge, an "employee 'must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign.'" *Caldwell*, 689 F Appx at 319–20, quoting *Stover v Hattiesburg Public School District*, 549 F3d 985, 991 (5th Cir 2008); see also *Benningfield v City of Houston*, 157 F3d 369, 378 (5th Cir 1998). "A plaintiff may also be 'constructively discharged if the employer gives the employee an ultimatum to quit or be fired.'" *Caldwell*, 689 F Appx at 320, quoting *Perret v Nationwide Mutual Insurance Co*, 770 F3d 336, 338 (5th Cir 2014). Importantly, constructive discharge doesn't occur "when a 'reasonable employee had other options . . . before choosing to leave his job.'" Ibid, quoting *Haley v Alliance Compressor LLC*, 391 F3d 644, 652 (5th Cir 2004).

Mitchell doesn't come close to meeting this standard. He may not have liked the investigation that HPD conducted, but HPD plainly has the authority to investigate the conduct of its officers. More important, Mitchell didn't face a "quit or be fired" scenario following that investigation. A less-than-honorable discharge certainly wasn't inevitable, as the Administrative Discipline Committee explicitly stated that it wasn't "opposed to a lengthy suspension." Dkt 55-11. Mitchell also had options other than resigning, including a chance to plead his case before Acevedo and an opportunity to appeal any decision Acevedo made. Dkts 55-10 at 65–66 & 55-18 at 46–51.

Rather than take any of those paths, Mitchell decided to resign with an honorable discharge. Dkts 55-1, 55-17 & 61-2 (discharge paperwork). The record indicates that no one forced him into this decision. For example, see Dkt 55-1

at 17–18. Quite the contrary, Mitchell had graduated from law school and desired to begin his own practice. Id at 4, 17; see also Dkt 55-14 at 4. Far from constructively discharging Mitchell, HPD accorded him lenience and allowed him his requested opportunity to resign with honor. Under any reasonable view of the situation, this would have constituted a final and binding end of the entire dispute. But Mitchell instead accepted that gesture of good will from HPD, only to turn around and file this action.

The initial complaint against Mitchell stated that the email he sent was "written in poor taste and poor judgment." Dkt 55-6. Much the same can be said about his initiation of this litigation. What's more, such conduct can easily be viewed as contrary to Rule 1 of the Southern District of Texas Rules of Discipline, which states, "Lawyers who practice before this court are required to act as mature and responsible professionals, and the minimum standard of practice shall be the Texas Disciplinary Rules of Professional Conduct." The preamble to the Texas rules notes that a "lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others." Rule 3.01 then specifically prohibits a lawyer from bringing a proceeding "unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous." And comment 2 of that rule goes on to say that a "filing or assertion" is *frivolous* for these purposes "if it is made primarily for the purpose of harassing or maliciously injuring" a person or entity.

Substantial questions exist as to whether Mitchell initiated this action on his own behalf "primarily for the purpose of harassing or maliciously injuring" his former employer; whether he evoked the hallmarks of a "mature and responsible" professional when he initiated this action *pro se*; and whether he has "use[d] the law's procedures only for legitimate purposes." But no question exists as to whether HPD constructively discharged Mitchell or otherwise took an adverse employment action against him. It didn't.

### c. Summary

No dispute of material fact exists. The employment actions taken by HPD during its investigation of Mitchell weren't ultimate employment decisions. And Mitchell wasn't constructively discharged. As a matter of law, then, Mitchell didn't suffer an *adverse employment action*. Summary judgment will be granted on Mitchell's First Amendment retaliation claims.

### 4. Bystander and *Monell* liability claims

Once the First Amendment retaliation claim is dismissed, the other claims resolve in like fashion.

*As to Section 1983 bystander liability,* the Fifth Circuit holds that an officer who didn't personally act against the plaintiff may be liable under Section 1983 pursuant to a bystander-liability theory where the officer knows that a fellow officer is violating an individual's constitutional rights, has a reasonable opportunity to prevent the harm, and chooses not to act. *Whitley v Hanna*, 726 F3d 631, 646 (5th Cir 2013). This standard plainly requires that a fellow officer commit a constitutional violation before another officer may be liable for failure to intervene.

With it determined above that no underlying constitutional violation exists, Acevedo, Finner, and Edwards can't be liable on theory of bystander liability. Summary judgment will be granted as to this claim.

*As to Monell liability,* a plaintiff can bring a claim under Section 1983 to hold a city liable for the unconstitutional actions of its employees. Such a claim requires a plaintiff to demonstrate a policymaker, an official policy or custom, and a violation of constitutional rights whose "moving force" is the official policy or custom. *Piotrowski v City of Houston*, 237 F3d 567, 578 (5th Cir 2001).

Again, such a claim requires an underlying constitutional violation. None exists. Summary judgment will be granted as to this claim.

## 5. Conclusion

The motion by Defendants the City of Houston, Houston Police Department Chief Art Acevedo, Assistant Chief Troy Finner, and Police Captain Daryn Edwards for summary judgment is GRANTED. Dkt 55.

The claims asserted by Plaintiff Kenneth Mitchell are DISMISSED WITH PREJUDICE.

A final judgment will issue separately.

SO ORDERED.

Signed on August 30, 2022, at Houston, Texas.

*[Signature]*
Hon. Charles Eskridge
United States District Judge